ZACHARY, Judge.
 

 *650
 
 Defendant Sydney Shakur Mercer was indicted for possession of a firearm by a felon and for two counts of assault with a deadly weapon with the intent to kill. A jury found defendant not guilty on both charges of assault, but guilty of possession of a firearm by a felon. Defendant appeals from judgment entered upon his conviction. On appeal, defendant argues that the trial court erred in denying his request for a jury instruction on justification as a defense to the charge of possession of a firearm by a felon. After careful review, we conclude that defendant was entitled to an instruction on justification as a defense.
 

 Background
 

 In April 2016, defendant was indicted for possession of a firearm by a felon and two counts of assault with a deadly weapon with the intent to kill. The charges against defendant were joined for trial and came on to be tried before a jury at the 20 March 2017 criminal session of Mecklenburg County Superior Court, the Honorable Jesse B. Caldwell, III presiding.
 

 The charges against defendant arose from an altercation that took place on 30 March 2016 on Peach Park Lane in Charlotte, during which defendant, a convicted felon, possessed a gun. During the events that gave rise to the charges against defendant, defendant resided on Peach Park Lane, near the home of Dazoveen Mingo. On 29 March 2016, Dazoveen was playing basketball in the neighborhood. Defendant's cousin Wardell was also present, and, at some point, Wardell's phone was stolen. He believed that Dazoveen was the culprit and the two nearly fought. The following day, Dazoveen was "walking ... to the candy man" when he encountered Wardell and an individual he identified as "J." Wardell repeated his previous accusation that Dazoveen had stolen his phone, and a fight occurred. Defendant's mother broke up the fight.
 

 Dazoveen left and notified his brother, Nacharles Bailey, who informed their mother, Dorether Mingo ("Ms. Mingo"). While Dazoveen and Nacharles waited for her to arrive home, Ms. Mingo called her sister, Lina. Ms. Mingo and her other son, Jaquarius, arrived at their home
 
 *651
 
 within approximately five to ten minutes. The Mingos and additional family members then walked over to defendant's home, where Wardell was visiting, with the intention of fighting. At that point, an altercation occurred. The participants and witnesses provided different versions of the event at trial.
 

 I. The State's Evidence
 

 At trial, the State presented evidence tending to show the following: Dazoveen testified that approximately fifteen people walked to defendant's home in order to fight. The only armed person in the Mingo group was Dazoveen's aunt, Lina, who arrived later. Upon
 
 *377
 
 their arrival at defendant's home, a black Cadillac pulled into the driveway and defendant, Wardell, and J got out of the car. "When we [were] getting ready to fight," Dazoveen saw that defendant had a handgun "at his belt buckle." Dazoveen did not say anything to defendant, but told Wardell "to come fight [him]." Dazoveen further testified:
 

 Q. All right. And what, if anything, did you hear anybody else saying to [defendant]?
 

 A. Well, basically my brother and them was telling him to fight. Basically they was telling everybody to fight.
 

 Q. Okay. Which brother was talking to [defendant]?
 

 A. Both of them.
 

 Meanwhile, defendant's mother was attempting to "calm[ ] down ... the situation." Dazoveen testified that after defendant showed a gun, "we [were] still trying to fight, and they [were] backing up, and we [were] coming towards them. And that's when [defendant] had shot [the gun] in the air." After defendant fired one shot in the air, Dazoveen's "aunt came running through the path, and then [Ms. Mingo] snatched the gun from her and shot up in the air." Defendant then "shot back into the air[ ]" and Ms. Mingo shot into the air again. Following these shots, Dazoveen and his relatives returned to the Mingo home, and Dazoveen's aunt called the police. Dazoveen and Ms. Mingo both gave recorded statements at the police station and watched a surveillance video of the altercation which was taken from a nearby home on the same street.
 

 At trial, Dazoveen watched the video and testified that three people had guns during the altercation: defendant, Ms. Mingo, and Dazoveen's brother, Nacharles. He also testified that Nacharles fired his gun, but he could not tell at whom Nacharles was firing. After viewing a video of the statement he gave to police to refresh his recollection, Dazoveen
 
 *652
 
 testified that he told a detective that defendant's mother had broken up the fight between him, Wardell, and J on 29 March 2016, and that both of Dazoveen's brothers, Jaquarious and Nacharles, fired the same gun during the altercation on 30 March 2016.
 

 Ms. Mingo also testified for the State as follows: On 30 March 2016, she received a phone call from her son, Nacharles, in which he informed her that Dazoveen "had been jumped." Her other son, Jaquarious, was with her at the time, and they drove home, during which time she did not make any phone calls. She found that her mother, her sisters, three of her nephews, three of her nieces, and "[her] whole family, pretty much, [were] at the house when [she] pulled up." After seeing her son Dazoveen's injuries from his fight with Wardell and J, she "immediately went to ... [defendant's] house through the path, there's a path, and as a result of me going, my oldest two went over there to approach [defendant] and the guy J and the guy Wardell." Ms. Mingo's sons were ready to fight and "[she] was not trying to stop [the fight]." Defendant "was the only one that had the gun out," which he had removed from his pants, and he was pointing the gun while saying, "back up, back up."
 

 Her sons "continued to advance on him even though he had [a] gun out[.]" Defendant's mother was "standing in front of him telling him, Sydney, put the gun up, put the gun up." Ms. Mingo testified that by this point, she was screaming, "If you going to shoot, shoot. If you're not, put the gun up." Defendant fired his first shot "over his mom's head" toward Ms. Mingo and her family. Ms. Mingo ran after that first shot and "snatched" her sister's gun from her hand and fired it in the air. She testified that defendant shot toward her "[m]aybe three" times and that she shot toward him "four times, maybe." Nacharles then took the gun from Ms. Mingo, but he did not shoot it because it was empty.
 

 II. Defendant's Evidence
 

 At the conclusion of the State's evidence, defendant presented evidence which tended to show the following: Defendant's mother, Rashieka Mercer ("Ms. Mercer"), testified at trial that, on 30 March 2016, she "heard a bunch of commotion outside" of her house, went outside, and witnessed Wardell and Dazoveen "engaged in a fight." She "told them to stop it, and at that point [Dazoveen] got up and he left" while "screaming out that he
 
 *378
 
 was going to get his brothers and they were going to kill [Wardell]." She further testified that no one else was present or involved in the fight other than Dazoveen and Wardell. Later that same day, Ms. Mercer heard another commotion outside of her house, and when she went outside, she "saw a crowd of people basically
 
 *653
 
 ambushing [her] son[.]" Ms. Mercer ran outside and tried to explain that defendant had nothing to do with the earlier fight. At that point, she observed that Nacharles had a gun, "so [she] got in front of [defendant] trying to shield him[.]" Defendant also had a gun. Ms. Mingo "was telling her son [Nacharles] to shoot [defendant]." Nacharles shot his gun, and Ms. Mercer screamed at the crowd about getting defendant out of there because they were trying to kill him. She also witnessed Ms. Mingo "chasing [defendant] and shooting at him."
 

 Defendant testified in his own defense to the following facts: On 30 March 2016, after arriving home from a job interview, defendant encountered a group of approximately fifteen people trying to fight. He knew Nacharles, Jaquarious, and Dazoveen, but did not know the other people. He testified that "[t]he mother of [his] child" was with him in the car. After defendant asked the crowd what was going on, they told him that jumping their little brother was not right, to which defendant responded, "I [didn't] have [anything] to do with it." However, the group kept approaching defendant, stating that they were "done talking." Defendant observed the handles of three handguns in the possession of Jaquarious, Nacharles, and another person he did not know. At that point, Wardell had also pulled a gun out while "talking to them" and "just basically trying to plead our case." Defendant then heard the sound of people cocking their guns, so he asked Wardell to give him the gun, and because "[Wardell] didn't know what he was doing," defendant took the gun from him. Defendant continued trying to plead his case with the group. Defendant was aware that, as a convicted felon, he was not allowed to possess a firearm, but testified that "Wardell [ ] is my little cousin. So at that time, my mother being out there, ... I would rather make sure we [are] alive versus my little cousin making sure, who is struggling with the gun." He then pointed the gun at the Mingos and "[kept] telling them to back up" several times. Defendant pointed the gun at Jaquarious because he "ran up on to the side and right beside [defendant's] mother," and then "shots were being fired" by someone else, but defendant could not tell who was firing them. Defendant "turned around to see who shot at Shoe,"
 
 [1]
 
 and, after telling his mother to move out of the way, he "dashed to the side of the street," and observed that Nacharles was "still shooting at [him], so [defendant] tried to shoot." However, the gun jammed and he threw it to Wardell so "he [could] fix it because it's his gun, and [defendant] just [ran] home." Defendant testified that he "only fired one shot," toward Nacharles "because he was shooting
 
 *654
 
 first." Defendant turned himself in to the police early the next morning around midnight.
 

 During the charge conference, defendant made a timely request in writing that the trial court instruct the jury on a justification defense to the charge of possession of a firearm by a felon, which the trial court denied. Defendant objected to the trial court's failure to instruct the jury on justification. During jury deliberations, the jury sent the trial court a note regarding "Justification Defense For Possession of Firearm," in which the jury asked the trial court for "Clarification on whether or not [defendant] can be justified in possession of a firearm even with the stipulation of convicted felon." The trial court responded by "reread[ing] and recharg[ing] its instruction on reasonable doubt and on possession of a firearm by a felon." Defendant was found not guilty of both charges of assault with a deadly weapon with intent to kill and guilty of the charge of possession of a firearm by a convicted felon.
 

 On appeal, defendant asserts that the trial court erred by refusing his request for a jury instruction on justification as a defense to the charge of possession of a firearm by a felon.
 

 Standard of Review
 

 It is axiomatic that "the trial court must give the instructions requested, at least
 
 *379
 
 in substance, if they are proper and supported by the evidence. The proffered instruction must ... contain a correct legal request and be pertinent to the evidence and the issues of the case."
 
 State v. Edwards
 
 ,
 
 239 N.C. App. 391
 
 , 392,
 
 768 S.E.2d 619
 
 , 620 (2015) (citations and quotation marks omitted). "[T]he question of whether a defendant is entitled to an instruction on the defense of duress or necessity presents a question of law, and is reviewed
 
 de novo
 
 ."
 
 Id
 
 . at 393,
 
 768 S.E.2d at 621
 
 . Accordingly, "where the request for a specific instruction raises a question of law, 'the trial court's decisions regarding jury instructions are reviewed
 
 de novo
 
 by this Court.' "
 
 Id
 
 . (quoting
 
 State v. Osorio
 
 ,
 
 196 N.C. App. 458
 
 , 466,
 
 675 S.E.2d 144
 
 , 149 (2009) ).
 

 We review the evidence in the light most favorable to the defendant.
 
 State v. Monroe
 
 ,
 
 233 N.C. App. 563
 
 , 567,
 
 756 S.E.2d 376
 
 , 379 (2014),
 
 aff'd per curiam
 
 ,
 
 367 N.C. 771
 
 ,
 
 768 S.E.2d 292
 
 (2015) ("[W]e review the evidence in the present case in the light most favorable to [the] [d]efendant, in order to determine whether there is substantial evidence of each element of the defense.").
 

 *655
 

 Discussion
 

 On appeal, defendant argues that the trial court erred by denying his request for an instruction on justification as a defense to the charge of possession of a firearm by a felon. After careful review of the evidence in the light most favorable to defendant, we hold that there was substantial evidence of each element of the justification defense in the present case, and defendant was entitled to have the jury instructed on the defense of justification.
 

 Under North Carolina law, "[i]t shall be unlawful for any person who has been convicted of a felony to purchase, own, possess, or have in his custody, care, or control any firearm or any weapon of mass death and destruction as defined in [
 
 N.C. Gen. Stat. § 14-288.8
 
 (c) ]."
 
 N.C. Gen. Stat. § 14-415.1
 
 (a) (2017). "The offense of possession of a firearm by a convicted felon has two essential elements: (1) the defendant has been convicted of a felony, and (2) the defendant subsequently possessed a firearm."
 
 State v. Floyd
 
 ,
 
 369 N.C. 329
 
 , 333,
 
 794 S.E.2d 460
 
 , 463 (2016) (citation omitted);
 
 see also
 

 State v. Wood
 
 ,
 
 185 N.C. App. 227
 
 , 235,
 
 647 S.E.2d 679
 
 , 686 (2007).
 

 A justification defense to possession of a firearm by a convicted felon was set forth in
 
 United States v. Deleveaux
 
 ,
 
 205 F.3d 1292
 
 , 1297 (11th Cir. 2000). The
 
 Deleveaux
 
 test provides that "a defendant must show four elements to establish justification as a defense" to a charge of possession of a firearm by a felon:
 

 (1) that the defendant was under unlawful and present, imminent, and impending threat of death or serious bodily injury; (2) that the defendant did not negligently or recklessly place himself in a situation where he would be forced to engage in criminal conduct; (3) that the defendant had no reasonable legal alternative to violating the law; and (4) that there was a direct causal relationship between the criminal action and the avoidance of the threatened harm.
 

 State v. Craig
 
 ,
 
 167 N.C. App. 793
 
 , 796,
 
 606 S.E.2d 387
 
 , 389 (2005) (quoting
 
 Deleveaux
 
 ,
 
 205 F.3d at
 
 1297 );
 
 see also
 

 United States v. Crittendon
 
 ,
 
 883 F.2d 326
 
 , 330 (4th Cir. 1989).
 

 This Court has not explicitly adopted the
 
 Deleveaux
 
 test; however, we have consistently "assume[d]
 
 arguendo
 
 , without deciding, that the
 
 Deleveaux
 
 rationale applies in North Carolina prosecutions for possession of a firearm by a felon."
 
 Monroe
 
 ,
 
 233 N.C. App. at 569
 
 ,
 
 756 S.E.2d at 380
 
 . In
 
 State v. Monroe
 
 , the defendant was engaged in an "on-going
 
 *656
 
 dispute" with another man, Davis.
 

 Id.
 

 The defendant was at the residence of another individual, Gordon, when Davis arrived in Gordon's front yard and threatened to "turn the heat up on" the defendant.
 
 Id.
 
 at 564,
 
 756 S.E.2d at 377
 
 . Evidence was also presented that earlier that day, Davis had barged into a residence in which the defendant was present, and that Davis stated he was "going to stay out here until the door come open" when he arrived at Gordon's residence.
 
 Id
 
 . However, "[t]he uncontroverted evidence at trial showed that [the] [d]efendant was
 
 inside
 
 Gordon's house when [the] [d]efendant took possession of a firearm":
 

 *380
 
 [The] [d]efendant's subsequent contentions are that Davis "had instigated violence against [the] [d]efendant before," and that remaining inside Gordon's residence would have been "no protection" because Davis had previously "barged in" to a residence where [the] [d]efendant was located. However, the evidence does not compel a conclusion that, while inside the residence, [the] [d]efendant was under unlawful and present, imminent, and impending threat of death or serious bodily injury.
 

 ...
 

 We thus cannot rely on the mere possibilities that (1) Davis may have been about to enter the residence and (2) that Davis then would have threatened death or serious bodily injury to [the] [d]efendant. [The] [d]efendant has failed to show that he was under "unlawful and present, imminent, and impending threat of death or serious bodily injury" at the time he took possession of the firearm.
 

 Id
 
 . at 570,
 
 756 S.E.2d at 381
 
 (quoting
 
 Craig
 
 ,
 
 167 N.C. App. at 796
 
 ,
 
 606 S.E.2d at
 
 389 ) (internal quotation marks omitted).
 

 We further concluded that the "[d]efendant also failed to show that he 'had no reasonable legal alternative to violating the law.' "
 
 Id
 
 . at 571,
 
 756 S.E.2d at 381
 
 . "The [d]efendant voluntarily armed himself and then walked to the doorway of the residence. [The] [d]efendant has not shown there was no acceptable legal alternative other than arming himself with a firearm, in violation of N.C. [Gen. Stat.] § 14-415.1, and walking to the doorway of Gordon's house."
 
 Id
 
 . Accordingly, this Court held that the evidence, "even when viewed in the light most favorable to [the] [d]efendant, does not support a conclusion that [the] [d]efendant, upon possessing the firearm, was under unlawful and present, imminent, and impending threat of death or serious bodily injury."
 
 Id.
 
 at 569,
 
 756 S.E.2d at 380
 
 .
 

 *657
 
 This Court has applied the
 
 Deleveaux
 
 test in several other cases as well, although the defendant has never satisfied each of the elements in any of these cases.
 
 See, e.g.
 
 ,
 
 Edwards,
 

 239 N.C. App. at 395
 
 , 768 S.E.2d at 622 (no evidence of facts in support of any elements of the
 
 Deleveaux
 
 test);
 
 State v. McNeil,
 

 196 N.C. App. 394
 
 ,
 
 674 S.E.2d 813
 
 (2009) (possession of firearm while under no present or imminent threat of death or injury);
 
 Craig
 
 ,
 
 167 N.C. App. at 797
 
 ,
 
 606 S.E.2d at 389
 
 (possession of firearm after threat subsided);
 
 State v. Boston
 
 ,
 
 165 N.C. App. 214
 
 ,
 
 598 S.E.2d 163
 
 (2004) (possession of firearm while under no present or imminent threat of death or injury);
 
 State v. Napier
 
 ,
 
 149 N.C. App. 462
 
 ,
 
 560 S.E.2d 867
 
 (2002) (possession of firearm while under no present or imminent threat of death or injury).
 

 The present case is distinguishable from the prior cases in which this Court has applied the
 
 Deleveaux
 
 test. Here, defendant presented evidence that he grabbed the gun only after he heard guns cocking and witnessed his cousin struggling with the gun. In defendant's brief, he addresses each element of the
 
 Deleveaux
 
 test as follows:
 

 a. [Defendant's] testimony that he only grabbed the gun from Wardell when he heard guns being cocked, and threw it back to Wardell when he was able to run away supported the first element of the defense: That he
 
 only possessed the gun during the time he was under an unlawful and present imminent and impending threat of death or serious bodily injury
 
 ;
 

 b. The evidence was uncontroverted that the Mingos came to [defendant's] premises as aggressors, intending to fight, and [defendant's] testimony that when he got out of his car they were already there seeking a fight supported the second element of the defense: That he
 
 did not negligently or recklessly place himself in this situation
 
 where he would be forced to engage in criminal conduct;
 

 c. [Defendant's] testimony that he continually used words, trying to "plead his case," in responding to the aggressors and that he only resorted to grabbing the gun from Wardell when he heard guns being cocked supported the third element of the defense: That he had
 
 no reasonable alternative to violate the law
 
 ; and
 

 d. [Defendant's] testimony that he only took possession of the gun when he heard guns being cocked and relinquished possession when he was able to run away
 
 *658
 
 supported the fourth element of the defense:
 
 *381
 
 That there was a
 
 direct causal relationship between the criminal action and the avoidance of the threatened harm
 
 .
 

 We find the facts presented and the application of the evidence to the elements of the
 
 Deleveaux
 
 test convincing.
 

 The State contends that, "even assuming the Court were to apply the
 
 Deleveaux
 
 test, ... the evidence does not support the third element that ... defendant had no reasonable legal alternative to violating the law." In advancing this argument, the State asserts that defendant could have left the dangerous scene at his home or called 911, both of which are legal alternatives "to violating the law by taking the gun from his cousin." We disagree. As defendant asserts in his reply brief, "[o]nce guns were cocked, time for the State's two alternative courses of action-calling 911 or running away through the park-had passed."
 

 The determination of whether defendant acted reasonably, in light of the possible legal alternatives, is a question for the jury, after appropriate instruction.
 
 See, e.g.,
 

 State v. Barrett
 
 ,
 
 20 N.C. App. 419
 
 , 423,
 
 201 S.E.2d 553
 
 , 555-56 (1974) ("The reasonableness of defendant's action and of his belief that force was necessary presents a jury question.") (citation omitted). Accordingly, defendant was entitled to have the jury instructed on justification as a defense to the charge of possession of a firearm by a felon.
 

 Furthermore, we conclude that defendant was prejudiced by this error. Pursuant to N.C. Gen. Stat. § 15A-1443(a), "a defendant is prejudiced by errors relating to rights arising other than under the Constitution of the United States when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial ...." N.C. Gen. Stat. § 15A-1443(a) (2017) ;
 
 see also
 

 State v. Rose
 
 ,
 
 323 N.C. 455
 
 , 458,
 
 373 S.E.2d 426
 
 , 428 (1988) (finding that the trial court's failure to give defendant's requested instruction was prejudicial under N.C. Gen. Stat. § 15A-1443(a) ).
 

 In the present case, it is undisputed that defendant fired one or more shots during the altercation. However, the jury was instructed on self-defense with regard to the assault charges. The jury then acquitted defendant of both charges of assault with a deadly weapon with intent to kill as well as the lesser-included offense of assault with a deadly weapon. In contrast, the jury was not instructed on justification with regard to the charge of possession of a firearm by a felon, and the jury then convicted defendant of that charge. Moreover, during jury deliberations, the jury sent the trial court a note titled "Justification Defense For Possession
 
 *659
 
 of Firearm," in which the jury asked the trial court for "Clarification on whether or not [defendant] can be justified in possession of a firearm even with the stipulation of convicted felon." We conclude that there is a reasonable probability that, had the trial court provided defendant's requested justification instruction to the jury, the jury would have reached a different result.
 
 See
 
 N.C. Gen. Stat. § 15A-1443(a).
 

 Conclusion
 

 For the reasons stated herein, we conclude that the trial court committed prejudicial error by denying defendant's request for a jury instruction on justification as a defense to the charge of possession of a firearm by a felon. Accordingly, we hold that defendant is entitled to a new trial.
 

 NEW TRIAL.
 

 Judges ELMORE and HUNTER, JR. concur.
 

 [1]
 

 "Shoe" is not mentioned at any other time throughout the trial transcript.