IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-408

No. COA20-263

Filed 3 August 2021

Bladen County, Nos. 17 CRS 50608; 17 CRS 50609

STATE OF NORTH CAROLINA,

v.

HAROLD EUGENE SWINDELL, Defendant.

Appeal by Defendant from judgments entered 27 November 2018 by Judge Jeffery K. Carpenter in Bladen County Superior Court. Heard in the Court of Appeals 10 March 2021.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Marc X. Sneed, for the State.*

*Leslie Rawls, for Defendant-Appellant.*

WOOD, Judge.

¶ 1        Defendant Harold Swindell ("Defendant") appeals from his convictions of second-degree murder and possession of a firearm by a felon. On appeal, Defendant contends the trial court erred when it declined to instruct the jury on justification as an affirmative defense to possession of a firearm by a felon. We agree.

## I.        Factual and Procedural Background

¶ 2        On May 17, 2017, Defendant received a phone call from his brother, Darryl. Darryl called Defendant because he was worried about a potential physical

altercation at Darryl's apartment complex. Defendant and his friend, Broadus Justice ("Justice"), traveled to Darryl's complex, where they witnessed Darryl engaging in a physical altercation with James Ratliff, Anthony Smith ("Anthony"), Bobby Lee Ratliff, and Cequel Stephens ("Cequel"). Defendant and Justice broke up the fight. Defendant, Justice, and Darryl then returned to Defendant's residence.

¶ 3    Darryl's wife called shortly thereafter, requesting Darryl return to their apartment complex. When the three returned to Darryl's apartment complex, Defendant remained outside and conversed with Darryl's neighbors. Defendant then noticed Lonnie Smith ("Lonnie") approach with James Ratliff, Anthony, Bobby Lee Ratliff, and Cequel.

¶ 4    Shawbrena Thurman ("Thurman"), a resident of the apartment complex, testified at trial. According to Thurman, Lonnie asked Defendant, "So you say somebody going to die?" Defendant responded he had no intention of killing anyone or getting into an altercation. In response, Lonnie began to hit Defendant in the face. Thurman testified she did not observe Defendant fall when Lonnie punched him. Thurman testified that, after the fight began, Cequel also engaged in the physical altercation. A crowd formed around them.

¶ 5    Thurman further testified Defendant came to the complex with a firearm and that he never dropped it during the fight with Lonnie. According to Thurman, Defendant yelled, "Back up," and Cequel retreated. Lonnie and Defendant continued

to fight for a few moments after Cequel ran. As Lonnie turned to run, Thurman watched as Defendant shot him. Thurman testified she never saw Lonnie with a gun. However, Thurman later testified, "[Lonnie] didn't never have a gun. He didn't never have a gun. He was trying to fight. And he pulled a gun out of his — and I don't even think he knew that he had a gun." She testified that once Lonnie fell, Defendant stood over him and shot again. Shaquay Mullins ("Mullins"), another resident, testified she observed Defendant pull a gun from his pants and shoot Lonnie.

¶ 6          Defendant's recollection of the altercation differed from Thurman and Mullins's. Defendant testified that when Lonnie initially hit him, he took a step back, slipped, and fell onto his buttocks. According to Defendant, Anthony yelled "[b]ack the F up." Defendant observed the crowd begin to retreat. Defendant believed Anthony had a gun because Justice also retreated. In Defendant's opinion, Justice was a large man who would not retreat from a smaller man like Anthony unless he had a firearm. Defendant testified he heard his brother warn that Anthony had a gun.

¶ 7          Defendant further testified he observed a gun a foot or two in front of him and reached up from the ground to obtain the gun before Lonnie could do so. Defendant admitted he intentionally fired the weapon three times because he believed he was about to be killed. Defendant testified he had this belief because he had heard Anthony yell, "Pop him." After Lonnie was shot, Defendant retreated to his vehicle

and left. Defendant called 911 and reported the shooting once he had returned to his residence.

¶ 8        Dr. Lauren Scott ("Dr. Scott") performed an autopsy on Lonnie and testified as an expert in forensic pathology at trial. According to Dr. Scott, Lonnie was shot two or three times. The autopsy report reveals one bullet had an upward trajectory, entering Lonnie's back, and traveling through organs into his chest. Another bullet entered Lonnie's right thigh, "centered 28.5 [inches] to the right heel[,]" and exiting "centered 27.5 [inches] to the right heel." A third wound track revealed a gunshot wound in Lonnie's left thigh. The autopsy report speculates whether the third wound track "represent[s] a re-entrance wound . . . or a separate gunshot wound."

¶ 9        At trial, Defendant requested a jury instruction on the affirmative defense of justification. The trial court denied this request. Defendant's counsel objected and renewed his objection after the jury received its instructions. On appeal, Defendant asserts the trial court erred in failing to instruct the jury on the justification defense.

## II.    Discussion

¶ 10        Defendant's sole argument on appeal is that the trial court erred in declining to instruct the jury on the affirmative defense of justification to possession of a firearm by a felon. "In North Carolina, requests for special jury instructions are allowable pursuant to [N.C. Gen. Stat.] §§ 1-181 and 1A-1, Rule 51(b)." *State v. Napier*, 149 N.C. App. 462, 463, 560 S.E.2d 867, 868 (2002). A trial court must give

all requested jury instructions if the requested instructions "are proper and supported by the evidence." *State v. Craig*, 167 N.C. App. 793, 795, 606 S.E.2d 387, 388 (2005) (citation omitted). To determine "whether a defendant is entitled to a requested instruction, [appellate courts] review de novo whether each element of the defense is supported by the evidence, when taken in the light most favorable to [the] defendant." *State v. Mercer*, 373 N.C. 459, 462, 838 S.E.2d 359, 362 (2020) (citation omitted); *see also State v. Montague*, 298 N.C. 752, 755, 259 S.E.2d 899, 902 (1979) (holding that if there is sufficient evidence in the light most favorable to defendant to support an instruction for an affirmative defense, "the instruction must be given even though the State's evidence is contradictory."(citation omitted)). A trial court's erroneous failure to give a requested instruction "is prejudicial and requires a new trial only if there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial." *State v. Castaneda*, 196 N.C. App. 109, 116, 674 S.E.2d 707, 712 (2009) (citation and quotation marks omitted).

¶ 11        Under N.C. Gen. Stat. § 14-415.1(a), it is "unlawful for any person who has been convicted of a felony to purchase, own, possess, or have in his custody, care, or control any firearm." N.C. Gen. Stat. § 14-415.1(a) (2020). A person found in violation of Section 14-415.1(a) is guilty of a Class G felony. N.C. Gen. Stat. § 14-415.1(a).

¶ 12        Our Supreme Court has recently adopted justification as an affirmative defense to possession of a firearm by a felon. *State v. Mercer*, 373 N.C. 459, 838 S.E.2d

359 (2020).[1] For a defendant to be entitled to a jury instruction on justification, he must meet a four-part test:

> (1) that the defendant was under unlawful and present, imminent, and impending threat of death or serious bodily injury; (2) that the defendant did not negligently or recklessly place himself in a situation where he would be forced to engage in criminal conduct; (3) that the defendant had no reasonable legal alternative to violating the law; and (4) that there was a direct causal relationship between the criminal action and the avoidance of the threatened harm.

*Id.* at 464, 838 S.E.2d at 363 (quoting *U.S. v. Deleveaux*, 205 F.3d 1292, 1297 (11th Cir. 2000)); *Craig*, 167 N.C. App. at 796, 606 S.E.2d at 389. The defense of justification has been reserved for "narrow and extraordinary circumstances." *Mercer*, 373 N.C. at 463, 838 S.E.2d at 362. The justification instruction must be given when evidence for each factor is presented. *Id.* at 464, 838 S.E.2d at 363.

Our case law has placed an emphasis on the timing of a defendant's possession of the firearm. To be entitled to the justification defense, a defendant must only possess the firearm while "under unlawful and present, imminent, and impending threat." *Id.* at 464, 838 S.E.2d at 363 (citation omitted). In *State v. Napier*, 149 N.C.

---

[1] The justification defense originates in our federal courts. *See U.S. v. Deleveaux*, 205 F.3d 1292 (11th Cir. 2000). Our Supreme Court's adoption of the justification defense for possession of a firearm by a felon comes after this Court applied the defense in several instances, assuming, but not deciding, that the justification defense applied in North Carolina.

App. 462, 560 S.E.2d 867 (2002), this Court held the justification defense is inapplicable to a defendant who voluntarily armed himself several hours prior to a threat. *Id.* at 464, 560 S.E.2d at 868-69. In *Napier*, the defendant was a convicted felon who had an ongoing dispute with a neighbor. *Id.* at 462, 560 S.E.2d at 868. The defendant walked to his neighbor's property and stayed there for several hours before shooting the neighbor's son. *Id.* at 463-65, 560 S.E.2d at 868-69. As the defendant was armed during a period where there was no "unlawful and present, imminent, and impending threat," this Court held he was not entitled to a justification instruction. *Id.* at 465, 560 S.E.2d at 869; *see also State v. Boston*, 165 N.C. App. 214, 222, 598 S.E.2d 163, 167-68 (2004); *State v. Monroe*, 233 N.C. App. 563, 570, 756 S.E.2d 376, 381 (2014); *State v. Edwards*, 239 N.C. App. 391, 396, 768 S.E.2d 619 (2015); *State v. McNeil*, 196 N.C. App. 394, 398, 674 S.E.2d 813, 821 (2009); *State v. Ponder*, No. COA11-1365, 220 N.C. App. 525, 725 S.E.2d 674, 2012 WL 1689526 (N.C. Ct. App. May 15, 2012) (unpublished) (all holding the defendant was not entitled to the justification defense because there was no imminent threat at the time the defendant acquired the firearm).

¶ 14        In *State v. Craig*, 167 N.C. App. 793, 606 S.E.2d 387 (2005), this Court declined to expand the justification doctrine to include instances where the defendant possessed the firearm after the threat had passed, "because there was a time period where [the d]efendant was under no imminent threat while possessing the gun." *Id.*

at 797, 606 S.E.2d at 389; *see also State v. McFadden*, No. COA15-957, 247 N.C. App. 400, 786 S.E.2d 433, 2016 WL 1745118 (2016) (N.C. Ct. App. May 3, 2016) (unpublished); *State v. Litaker*, No. COA19-189, 269 N.C. App. 385, 836 S.E.2d 782, 2020 WL 64798 (N.C. Ct. App. Jan. 7, 2020) (unpublished).

¶ 15    In addition to possessing the firearm in the presence of an imminent threat, a defendant must not have a reasonable alternative to violating the law. In *Edwards*, the defendant was found "standing with other[s] in a vacant lot . . . . When [the] defendant saw the officers, he 'hurriedly started walking away' and 'reached into his waistband and pulled out a [handgun] . . . .'" 239 N.C. App. at 391, 768 S.E.2d at 620. Although the defendant contended he was being threatened and needed the gun for protection, he failed to present evidence of "the circumstances under which defendant was 'in a situation where he would be forced to engage in criminal conduct'; [and] whether defendant had a reasonable alternative to violating the law . . . ." *Id.* at 395, 768 S.E.2d at 622. Because the defendant obtained the firearm nearly an hour before law enforcement discovered he was in possession of the weapon, this Court held he was not entitled to the justification defense. *Id.* at 394-95, 768 S.E.2d at 621-22.

¶ 16    Likewise, several of our unpublished justification decisions have recognized that, where the defendant obtains a firearm in anticipation of an imminent threat, he has a reasonable alternative to violating the law. *See e.g. Ponder*, No. COA11-1365, 220 N.C. App. 525, 725 S.E.2d 674, 2012 WL 1689526, at *2 (defendant not entitled

to justification where he voluntarily obtained a firearm and waited to confront the victim, instead of "telephon[ing] the police"); *State v. Lyles*, No. COA02-1139, 157 N.C. App. 142, 578 S.E.2d 327, 2003 WL 1701564, at *3 (N.C. Ct. App. April 1, 2003) (unpublished) (defendant had a reasonable alternative to violating the law where he "had only to refuse to take the gun that was already in [another's] safekeeping.").

¶ 17    However, the justification defense shall apply where a defendant can present evidence of all four elements. *See State v. Mercer*, 260 N.C. App. 649, 818 S.E.2d 375 (2018), *aff'd*, 373 N.C. 459, 838 S.E.2d 359 (2020). In *Mercer*, the defendant's cousin had been involved in several physical altercations in the defendant's neighborhood. *Id.* at 650-51, 818 S.E.2d at 376-77. The defendant's cousin was engaged in an altercation in the defendant's yard while the defendant was not home. Upon arriving, the defendant became involved in the altercation. *Id.* at 651, 818 S.E.2d at 377. The defendant heard guns cocking, and saw that his cousin, as well as the persons whom he had observed engaging in the altercation with his cousin, was armed. *Id.* at 653, 818 S.E.2d at 378. Defendant took possession of the firearm when he observed his cousin struggling with it. *Id.* At trial, the State presented evidence suggesting the defendant brought a firearm to the fight. *Id.* at 651, 818 S.E.2d at 376-77. The defendant was later convicted of possession of a firearm by a felon. *Id.* at 650, 818 S.E.2d at 376. On appeal, the State argued the defendant was not entitled to the justification defense, as his actions were not reasonable. However, this Court held

reasonableness was a "question for the jury, after appropriate instruction." *Id.* at 658, 818 S.E.2d at 381 (citation omitted).  This Court further held that the defendant was entitled to an instruction on justification, because the defendant presented evidence "that he only grabbed the gun . . . when he heard guns being cocked, and threw it back to [his cousin] when he was able to run away" and that he was not the aggressor. *Id.* at 657, 818 S.E.2d at 380.

¶ 18        In the present appeal, the evidence tends to show Defendant fell onto his buttocks after Lonnie hit him.  Defendant testified he was in "complete fear" and thought he was "about to be killed and using the gun was the only thing that could save his life."  Prior to the shooting, Defendant heard his brother call out, "Watch out. He got [sic] a gun."  Defendant heard Lonnie's brother say, "Pop him. Pop him," which he understood to mean "shoot him."  Defendant testified he only grabbed the gun because he fell and believed Lonnie would shoot him. Defendant's testimony that he fell to his buttocks is corroborated by the autopsy report, which provides that the likely-fatal bullet wound followed an upward trajectory.  Immediately after the shooting, Defendant "threw the gun" on the ground and ran to his vehicle.  Taking the evidence in the light most favorable to Defendant, we hold Defendant only possessed the firearm during the time he was under "an unlawful and present, imminent, and impending threat." *See Mercer*, 373 N.C. at 464, 838 S.E.2d at 363-64.

¶ 19        Addressing the second element, the evidence demonstrated that Defendant

broke up a fight earlier in the day. After the fight, Defendant returned to his residence for approximately fifteen minutes. Defendant, Darryl, and Justice returned to Darryl's complex at the request of Darryl's wife. After returning to the complex, Defendant remained outside and conversed with several residents, many of whom asked about the earlier fight. Approximately half an hour after Defendant returned to the complex, the second altercation occurred. Defendant was not the aggressor and attempted to explain to Lonnie that he was not there to fight with anyone. Taking "the evidence in the light most favorable to [D]efendant, we conclude that a jury could find [] he did not negligently or recklessly place himself in a situation where he would be forced to arm himself." *See id.* at 465, 838 S.E.2d at 364.

¶ 20        The State argues that, even if the first two elements are met, Defendant is not entitled to the justification instruction because he had a reasonable alternative to violating the law. The State contends Defendant could have retreated to his vehicle after the altercation began and left the scene without obtaining the firearm. Defendant testified that he "imagine[d]" he could have gotten into his vehicle and left prior to the shooting. However, evidence also tended to show Defendant was physically attacked by Lonnie—who had a reputation for violence—and that Defendant fell after Lonnie initiated the second fight. Defendant saw a gun in front of him and heard Lonnie's associates call for Lonnie to shoot him. Taking the evidence in the light most favorable to Defendant, "a reasonable jury could conclude that it

was too late to call 911 and that running away would have put him at greater risk of being shot. A jury could have concluded that defendant had no reasonable legal alternative to violating the law." *Id.*

¶ 21        Finally, Defendant meets the fourth element as there was evidence which tended to show a direct causal relationship between the avoidance of imminent harm and Defendant's possession of a firearm.  Defendant testified he only took possession of the firearm after he heard bystanders warning that the victim had a gun and because he had fallen onto his buttocks. Defendant feared that if he did not use the firearm, he would be shot. Further, Defendant abandoned the firearm when he was able to run away. Although the State presented evidence to the contrary, taking "the evidence in the light most favorable to [D]efendant, a jury could find that his gun possession was directly caused by his attempt to avoid a threatened harm." *Id.* at 466, 838 S.E.2d at 364.

¶ 22        Taking the evidence in the light most favorable to the defense, Defendant presented evidence in support of all factors necessary for the justification defense. As our Supreme Court emphasized in *Mercer*, we do not determine whether Defendant "was actually justified in his possession of the firearm, as the State did present relevant conflicting evidence on several points. We hold only that he was entitled to have the justification defense presented to the jury." *Id.*

¶ 23        Having determined Defendant was entitled to a jury instruction on

justification, we next determine whether Defendant was prejudiced by the trial court's failure to give such an instruction. *See id.* "[A] defendant is prejudiced by errors relating to rights arising other than under the Constitution of the United States when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." N.C. Gen. Stat. §15A-1443(a) (2020). Here, the jury was not instructed on the justification defense to possession of a firearm by a felon, and it subsequently convicted Defendant on that charge. We hold that, under the facts of this case, a reasonable jury may have acquitted Defendant had it been permitted to consider whether Defendant was justified in his possession of the firearm.

## III.  Conclusion

Viewing the evidence in the light most favorable to Defendant, we conclude Defendant has made the requisite showing of each element of the justification defense. The trial court committed prejudicial error by denying Defendant's request for a jury instruction on justification as a defense to the charge of possession of a firearm by a felon. Accordingly, we reverse and remand for a new trial.

REVERSED AND REMANDED.

Judge ZACHARY concurs.

Judge JACKSON dissents by separate opinion.

No. COA20-263 – *State v. Swindell*

JACKSON, Judge, dissenting.

¶ 25      The issue in this case is whether the trial court erred by denying Defendant's request for a jury instruction on justification as an affirmative defense to his charge of possession of a firearm by a felon. Because I believe the evidence shows that Defendant intentionally placed himself in a dangerous situation, and because he had many reasonable alternatives to violating the law, I would hold that Defendant could not have satisfied the elements of the justification defense. Accordingly, I would hold that the trial court did not err in denying Defendant's requested jury instruction. I respectfully dissent.

## I.      Factual and Procedural Background

¶ 26      This case arises out of a series of altercations that occurred between Defendant, his brother, and his brother's neighbors in May 2017. In the afternoon of 17 May 2017, Defendant was at home when he received a phone call from his brother Darryl Swindell, asking that Defendant come to Darryl's apartment complex (Oakdale Homes) to pick him up. Darryl asked for a ride because he owed his neighbors money and feared the neighbors might try to start a fight with him. Defendant left home, accompanied by his friend Broadus Justice, and the two drove

to Oakdale Homes to pick up Darryl.

¶ 27        When they arrived at Oakdale, Defendant saw four people (James Ratliff, Anthony Smith, Bobby Lee Ratliff, and Cequel Stephens) beating up his brother. As soon as Defendant got out of the car and began approaching the group, Cequel Stephens approached him and tried to punch him, but Defendant pushed him away. Defendant immediately set to work trying to break up the fight, which was over in approximately two to three minutes. As they began to leave, Anthony Smith shouted at Defendant and his brother "You don't belong out here anyway . . . This is NFL territory." Defendant knew that "NFL" was a local gang which was led by Anthony's brother, Lonnie Smith. Defendant ignored Anthony's statement and returned home with Broadus and his brother.

¶ 28        The group remained at Defendant's home for only ten to 15 minutes before receiving a phone call from Darryl's wife, who lived at Oakdale. Darryl's wife informed him that "the individuals [who fought with Darryl] were back," and Darryl relayed this information to Defendant. Darryl then "asked [Defendant] to take him back to his home" because he "was concerned." So Defendant drove his brother and Broadus back to Oakdale. As Defendant parked and got out of the car, he saw that a group of about ten neighbors were gathered in the Oakdale parking lot having a cookout. Defendant joined the group and remained there for some time, chatting with the neighbors.

After spending approximately 30 minutes socializing with neighbors in the parking lot, Defendant noticed a group of men approach from behind the apartment building. This group included several of the individuals who Defendant had seen fighting earlier that day (Cequel Stephens, Bobby Lee Ratliff, and Anthony Smith) as well as two other individuals who Defendant knew, but who had not been present at the earlier fight (Lonnie Smith and Robert Ratliff). The approaching group was led by Lonnie Smith, who Defendant knew to be "the leader of a local gang called 'NFL,'" and who Defendant characterized as "a pretty tough guy . . . pretty brutal" with a "bad reputation . . . for violence."

After this point, accounts differed on how the altercation between Lonnie and Defendant progressed. According to the voluntary statement which Defendant provided to Officer Rodney Warwick (which occurred later that same evening), Lonnie walked up to Defendant and asked if Defendant had been looking for him, to which Defendant responded "It weren't like that." Lonnie then "began to hit him" in the head and upper body, and the two "got into a tussle." "[A]s they tussled, other individuals became involved in the altercation; [and] during the altercation, a gun just suddenly appeared . . . everything happened quickly, and the gun just went off." Defendant told Officer Warwick that he had not brought the gun, and that he didn't know who the gun belonged to.

Defendant told Officer Warwick two slightly differing accounts of how the gun

ended up going off. Defendant first stated that after the gun appeared, there was a struggle for possession of the weapon, and that "during the tussle for the weapon, that he never had it, but that he definitely touched it," and that he eventually "heard it go off." In another account, Defendant stated that he and Lonnie "struggled over the gun, that [Defendant] got the gun, and the gun went off."

¶ 32         Defendant's trial testimony painted a different picture of the altercation. According to Defendant's trial testimony, as Lonnie and his group approached him in the Oakdale parking lot, Lonnie asked if Defendant had been fighting with Lonnie's brother Anthony. In an attempt to diffuse the situation, Defendant replied "[n]o, I didn't jump on your brother. I was just trying to . . . break up a fight." But Lonnie was not deterred, and began punching Defendant in the head and face. At some point, Lonnie hit Defendant so hard that he stumbled backwards, slipped on some trash on the ground, and fell backwards onto the ground.

¶ 33         Defendant stated that as he was sitting on the ground, trying to recover, Lonnie's brother (Anthony) and Cequel Stephens approached from the side, and Anthony screamed "back the F up" to "the other guys that were with [Defendant]." Defendant's friends obeyed, and backed up away from the fight—which caused Defendant to feel afraid because his friends are large and formidable, whereas Anthony (the one telling them to back up) was "a little guy." Defendant surmised that Anthony must be holding a gun, because otherwise his friends would not have

"backed up [that] easy."

Defendant testified that Darryl then called out to him, saying "Watch out. He got a gun." Somewhere in the commotion, Defendant noticed "a gun on the ground" in front of him, but he did not see where it came from. As Anthony and Cequel continued to approach him, Defendant heard one of them say "Pop him," which he understood to mean shoot him. According to Defendant, he then saw Lonnie reach for the gun on the ground, but before Lonnie could reach it Defendant snatched up the gun.

Defendant testified that at that point, he was feeling "complete fear" for his life, because he thought that Lonnie was reaching for the gun to shoot him, and he suspected that Anthony had a gun as well. Defendant stated that he believed that picking up the gun was "the only thing that could save [his] life at that time." Defendant testified that he then "just picked [the gun] up, basically, and fired" at Lonnie. As soon as he fired the gun, Defendant then dropped it, got into his car, and drove away as quickly as he could.

A witness to the altercation, Shawnbrena Thurman, offered a different account of that night's events during her trial testimony. She stated that as she watched Lonnie approach Defendant, she knew that Lonnie came with the intention of fighting—in fact, she even attempted to stop Lonnie as he approached Defendant, but Lonnie was determined to fight. She testified that after Lonnie reached Defendant,

the two began speaking, and she overheard Lonnie say to Defendant "Oh, so you say somebody going to die?" to which Defendant responded "Nah man. It ain't even like that." She then saw Lonnie hit Defendant in the side of the face, and the two men began "throwing their hands up like they was going to fight," and "[s]quaring up to fight." She stated that this "squaring up" went on for some time, and that "[t]he whole time when they was doing the square-up thing, they didn't never say nothing to each other." Lonnie swung at Defendant again, and the two men began throwing punches. She stated that she never saw Defendant fall to the ground.

¶ 37        Soon after, she saw Cequel Stephens "[come] around on the other side of Lonnie like he wanted to fight too, like, trying to act like he was squaring up." Defendant then "backed up and just snatched the gun from [Cequel], right there from the front of his pants." Defendant then told Cequel to "back up," and Cequel ran away. She testified that Lonnie didn't run away, however—Lonnie "was still, like trying to fight [Defendant], even with the gun." Unlike with Cequel, she did not hear Defendant give Lonnie a warning—"[Defendant] didn't never say anything to Lonnie like, 'Back up.' He just went to him like, pow, and just shot him . . . . He just did it."

¶ 38        Shawnbrena testified that after being shot once, Lonnie tried to run away and fell, but Defendant pursued Lonnie, and "shot him again" while he was "on the ground"—"[Lonnie] hit the ground falling, [and Defendant] was already up on top of him and shot him again." While Lonnie lay on the ground bleeding, Shawnbrena

asked Defendant why he shot Lonnie, and Defendant responded "I told that MF"er." She testified that she never saw Lonnie holding a gun, and that even after Defendant grabbed the gun from Cequel, there was never "any fight or tussle over the gun," and Defendant "had it in his hand the whole time."

¶ 39    Witness Shaquay Mullins offered similar testimony at trial, stating that as soon as Lonnie threw the first punch at Defendant, the two men started to "square up one-on-one" to fight. As a crowd began to gather around the fight, she heard Defendant say "If y'all jump me, then I'm going to kill all of y'all." The next thing she saw was that Defendant "pulled the gun out of his pants and just started shooting." She testified that as soon as Defendant started shooting, Lonnie had tried to run away, but that Lonnie "got caught in the back of the legs" by one of Defendant's bullets before he could escape. She stated that Defendant fired at Lonnie "four or five times," and that Lonnie was shot while "he was running away." She never saw Lonnie with a gun.

¶ 40    The State presented forensic evidence from Dr. Lauren Scott at trial, indicating that Lonnie Smith had died from two to three gunshot wounds. One gunshot had entered the right side of his back and exited in the front of his chest; a second had entered from the side of his right leg and exited from the front of his thigh; and a third had entered from the middle of his left thigh and exited from the side of his left leg. Dr. Scott was unable to determine if the gunshot wounds on Lonnie's legs had

originated from a single gunshot, or two different gunshots. Dr. Scott stated that the first gunshot wound to the back would have been fatal.

¶ 41 Defendant was indicted on 5 June 2017 in Bladen County Superior Court for first-degree murder and possession of a firearm by a felon.[2] Trial occurred beginning on 13 November 2018 before Judge Jeffery K. Carpenter. Following the presentation of all evidence, Defendant's trial counsel requested that the jury be instructed on self-defense (with regard to the murder charge) and on justification (with regard to the possession of a firearm charge). After hearing argument, the trial court ultimately ruled that Defendant was not entitled to the jury instruction on justification, but chose to still instruct the jury on self-defense.

¶ 42 On 27 November 2018, the jury issued a verdict finding Defendant guilty of second-degree murder and possession of a firearm by a felon. The trial court sentenced Defendant to 300 to 372 months for second-degree murder and a consecutive term of 19 to 32 months for possession of a firearm by a felon. Defendant filed a timely appeal to this Court.

## II. Analysis

¶ 43 Defendant raises only one issue on appeal, contending that the trial court erred by denying his requested jury instruction on the justification defense as a potential

---

[2] Defendant was previously convicted of a felony, possession with intent to sell and deliver marijuana, on 16 June 2013.

affirmative defense to the charge of possession of a firearm by a felon. For the reasons explained below, I would hold that the trial court did not err in refusing Defendant's request for this instruction.

**A. Preservation**

As an initial matter, I first address whether Defendant has properly preserved this issue for appellate review. Specifically, it is necessary to address Defendant's failure to include a copy of his written request for special jury instructions in the appellate record.

Our statutes provide that when a party desires that the trial court provide a specific jury instruction to the jury, the party "may tender written instructions" to the trial court and the other parties "[a]t the close of the evidence or at an earlier time directed by the judge." N.C. Gen. Stat. § 15A-1231(a) (2019). Though the statute uses the permissive verb "may," our courts have typically held that requests for jury instructions must be in writing. *See, e.g., State v. Augustine*, 359 N.C. 709, 729, 616 S.E.2d 515, 530 (2005) ("[T]his Court has held that a trial court did not err where it declined to give requested instructions that had not been submitted in writing.").

However, I believe this rule is still satisfied when it is clear from the *entire record* that the defendant did, in fact, submit a written instruction request to the trial court—even though the written request was somehow omitted from the appellate record. *See, e.g., State v. Locklear*, 363 N.C. 438, 472, 681 S.E.2d 293, 317 (Brady, J.,

dissenting) (2009) (concluding that the defendant's instruction request was improper when "*nothing in the record* indicat[es] that defendant ever tendered a written request to the trial court") (emphasis added).

¶ 47        Here, although the record does not contain a copy of Defendant's requested written jury instruction on justification, the transcript makes clear that Defendant did, in fact, submit a written request to the trial court. During the charge conference on the final day of trial, the transcript demonstrates that Defendant "handed" the prosecutor and the trial court "a request for jury instructions regarding the possession of a firearm by a felon [charge] that contemplates the *Deleveaux* [justification] test." Moreover, on several occasions during bench conferences the trial court discussed or recited the *Deleveaux* factors (which are the most commonly accepted test for the justification defense), apparently reading from Defendant's written requested jury instruction.

¶ 48        Moreover, after the trial court ultimately denied Defendant's requested instruction, Defendant objected, and the court stated that it would "note your objection for the record. It's certainly . . . an issue that's explorable on appeal." Defendant also properly objected after the instructions were presented to the jury. *See* N.C. R. App. P. Rule 10(a)(2); *Geoscience Grp., Inc. v. Waters Const. Co.*, 234 N.C. App. 680, 686-87, 759 S.E.2d 696, 700-01 (2014) (noting that our appellate rules require counsel to object to disputed jury instructions both during the charge

conference and before the jury retires for deliberation).

¶ 49    Thus, I believe the record demonstrates that Defendant properly submitted his request for the justification instruction in writing, and that Defendant properly objected to the jury instructions in accord with our Appellate Rules.  I would hold that this issue has been preserved.

**B. Justification Defense**

¶ 50    Defendant contends that the trial court should have instructed the jury on the justification defense in connection with his charge of possession of a firearm by a felon.  Under North Carolina law, it is illegal for a convicted felon to possess a firearm, no matter how briefly or temporarily.  *See* N.C. Gen. Stat. § 14-415.1(a) (2019) (making it "unlawful for any person who has been convicted of a felony to purchase, own, possess, or have in his custody, care, or control any firearm").  However, our Supreme Court has recently held, in a case of first impression, that a felon may nevertheless possess a firearm under "narrow and extraordinary circumstances" when presented with an "imminent and impending threat of death or serious bodily injury," such that he has no choice but to arm himself in his defense.  *State v. Mercer*, 373 N.C. 459, 462-64, 838 S.E.2d 359, 362-63 (2020).  This doctrine is known as the justification defense, and functions as "an affirmative defense," similar to self-defense, which requires that the defendant prove all elements of the defense "to the satisfaction of the jury" in order to be excused of liability for possessing a firearm.  *Id.*

at 463, 838 S.E.2d at 363.

¶ 51     In general, a trial court must give the substance of a requested jury instruction if it is "correct in itself and supported by [the] evidence." *Locklear*, 363 N.C. at 464, 681 S.E.2d at 312 (internal marks and citation omitted). In order to determine "whether a defendant is entitled to a requested instruction, we review de novo whether each element of the defense is supported by the evidence, when taken in the light most favorable to defendant." *Mercer*, 373 N.C. at 462, 838 S.E.2d at 362. A trial court's erroneous failure to give a requested instruction "is prejudicial and requires a new trial only if there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial." *State v. Castaneda*, 196 N.C. App. 109, 116, 674 S.E.2d 707, 712 (2009) (internal marks and citation omitted). "The defendant has the burden of demonstrating prejudice." *Id.*

¶ 52     The four elements of the justification defense are as follows:

> (1)     that the defendant was under unlawful and present, imminent, and impending threat of death or serious bodily injury;
>
> (2)     that the defendant did not negligently or recklessly place himself in a situation where he would be forced to engage in criminal conduct;
>
> (3)     that the defendant had no reasonable legal alternative to violating the law; and
>
> (4)     that there was a direct causal relationship between

the criminal action and the avoidance of the threatened
harm.

*Mercer*, 373 N.C. at 464, 838 S.E.2d at 363 (quoting *United States v. Deleveaux*, 205
F.3d 1292 (11th Cir. 2000)). A trial court is required to instruct the jury on
justification when evidence of each of the four elements is present. *Id.*

¶ 53          The most prominent case analyzing these four elements was *Mercer*, wherein
the defendant illegally fired a weapon after a large group of people ambushed him
outside his home. *Id.* at 460, 838 S.E.2d at 361. A group of 15 people had "walked to
defendant's home to fight two of defendant's friends," and when the defendant arrived
home he found the group in his driveway "urging defendant and his friends to fight
them and blocking defendant from going into his house." *Id.* The defendant tried to
speak to them to diffuse the situation, but the group "continued to approach him
saying they were 'done talking.'" *Id.* The defendant noticed that several members of
the group were armed, and he "heard the sound of guns cocking." *Id.* He noticed that
his younger cousin had a gun too, and was struggling to operate it—so the defendant
took the gun from his cousin, pointed it at the group and "told them to 'back up.'" *Id.*
at 461, 838 S.E.2d at 361. He heard shots begin to fire, and he "dashed to the side of
the street" to get away, but when he saw over his shoulder that someone was still
shooting at him, he "shot back once and then the gun jammed," whereupon he
immediately "threw the gun back" to his cousin and ran away. *Id.* The defendant's

testimony was supported by the testimony of his mother, who confirmed that a large group had "ambush[ed]" defendant as he arrived home; that several members of the group were armed; and that someone from the group was "chasing defendant and shooting at him." *Id*. at 460-61, 838 S.E.2d at 361.

¶ 54        During trial, the defendant requested that the jury be instructed on the justification defense (in accord with *United States v. Deleveaux*), but the trial court denied his request. *Id*. The case was appealed to our Supreme Court, which formally adopted the justification test as set out in *Deleveaux*, while emphasizing that the defense was only available under "narrow and extraordinary circumstances." *Id*. at 463, 838 S.E.2d at 362. After revieing each of the four *Deleveaux* elements, the Court ultimately held that the defendant had presented sufficient evidence to entitle him to the jury instruction. *Id*. at 464, 838 S.E.2d at 363.

¶ 55        The Court found that the first element—whether the defendant was under an imminent serious threat—was satisfied because the defendant was ambushed by a large aggressive group outside his house, and while "backing away from the group, defendant heard the sound of guns cocking and heard someone in the group say they were 'done talking.'" *Id*. at 464-65, 838 S.E.2d at 363-64. The Court found that the second element—whether the defendant recklessly placed himself in a dangerous situation—was satisfied because the defendant found himself in this situation "simply by arriving at his home and trying to explain himself to the group who were

blocking him from entering his home." *Id*. at 465, 838 S.E.2d at 364.

¶ 56        The Court found that the third element—whether the defendant had a reasonable alternative to breaking the law—was satisfied because, after the defendant heard guns being cocked, "a reasonable jury could conclude that it was too late to call 911 and that running away would have put him at greater risk of being shot." *Id*. The Court found that the fourth and final element—whether there was a causal relationship between the criminal action and the threatened harm—was satisfied because the defendant only briefly took possession of the gun "when he heard other guns being cocked, and he gave the gun back to his cousin when it jammed and he was able to run away." *Id*. Thus, because the defendant "presented sufficient evidence of each *Deleveaux* factor," the Supreme Court held that "he was entitled to have the justification defense presented to the jury." *Id*. at 466, 838 S.E.2d at 364.

¶ 57        Applying these elements in the present case, I conclude that Defendant has not presented sufficient evidence of each of the four *Deleveaux* factors and thus the trial court did not err in denying him the jury instruction. Specifically, I do not believe that Defendant can satisfy either the second or third element of the test.

¶ 58        The second element of the *Deleveaux* test requires a showing that Defendant "did not negligently or recklessly place himself in a situation where he would be forced to engage in criminal conduct." *Mercer*, 373 N.C. at 464, 838 S.E.2d at 363. Here during the afternoon of 17 May 2017, Defendant had several opportunities to avoid a

dangerous confrontation at Oakdale Homes, but each time he chose to go forward despite the danger.

¶ 59      First, Defendant chose to go back to Oakdale Homes for a second time that afternoon, fresh from a fight, despite knowing that more trouble was likely to ensue. Defendant's first visit to Oakdale Homes that afternoon involved breaking up a fight between his brother (Darryl), Lonnie's brother (Anthony), and several others. As Defendant was leaving the fight, Anthony shouted at them "You don't belong out here anyway . . . This is NFL territory"—putting Defendant on notice that he was unwelcome at Oakdale and that Oakdale was considered gang territory.

¶ 60      Defendant then drove his brother to Defendant's home, where they remained for only ten to 15 minutes before receiving a phone call from Darryl's wife, who lived at Oakdale. Darryl's wife informed him that "the individuals [who fought with Darryl] were back," and Darryl relayed this information to Defendant. Darryl then "asked [Defendant] to take him back to his home" because he "was concerned." So, despite knowing that the people he had just fought with were at still at Oakdale, Defendant chose to leave his house again and drive his brother back to Oakdale.

¶ 61      Moreover, according to the written statement that Officer Warwick recorded during his interview with Defendant (which occurred the same night as the shooting), Defendant answered as follows when asked why he returned to Oakdale Homes for a second time that afternoon:

> **[Officer Warwick]:** Being that there was an altercation that . . . [Defendant] went and got his brother from, and then he agreed to take his brother back in just a short time when he knew there was problems, he – he kind of downplayed it, indicated that he – he didn't suspect there would be additional problems, but if there was, that it would only be – rise to the level of a fight.
>
> **[Prosecutor]:** Okay. So [Defendant] told you – he acknowledged there was a likelihood of a fight going back over there?
>
> . . .
>
> **[Officer Warwick]:** Yes

Defendant had a multitude of safer options available to him instead of returning to Oakdale—he could have stayed home and lent his vehicle to his brother so Darryl could to Oakdale; he could have asked his friend Broadus (who was present with Defendant throughout the whole day) to drop off Darryl; he could have convinced Darryl to stay at Defendant's place until things cooled down; he could have told Darryl's wife to stay inside and call the police if she feared another fight. But Defendant took none of these reasonable precautions—instead, he chose to return to Oakdale, fully knowing that he would see the people he had just fought, and fully knowing there was "a likelihood of a fight" should he return.

Even more rashly, once Defendant arrived at Oakdale, he didn't simply drop his brother off and then depart. Nor did he go inside his brother's apartment to avoid further confrontation. Instead, Defendant chose to congregate with a group of people

out in the open in the Oakdale parking lot, chatting and mingling, and even talking with the neighbors about the earlier fight. After spending at least 30 minutes outside chatting, Defendant then saw a group of men approaching him—a group which was led by Lonnie Smith, and also included several of the men who had fought his brother earlier that day (Cequel Stephens, Bobby Lee Ratliff, and Anthony Smith). Defendant knew that Lonnie was dangerous—he himself described Lonnie as "a pretty tough guy . . . pretty brutal" with a "bad reputation . . . for violence," and Defendant further knew that Lonnie was "the leader of a local gang called 'NFL.'" But Defendant nevertheless stood his ground and watched as Lonnie approached.

¶ 64        The moment that Defendant saw Lonnie and the group approaching, he again had a number of safer options available to him—he could have immediately left in his vehicle (which remained in close proximity); he could have gone inside his brother's apartment; he could have called the police if he feared for his safety. In fact, Defendant himself acknowledged that he knew he could have simply gotten in his car and left the moment he saw Lonnie approaching:

> **[Prosecutor]:** So when Mr. Smith approached you . . . you could have – instead of talking to him, you could have just gone – gone to your car and left. You could have done that, couldn't you?
>
> **[Defendant]:** Before he punched me, I just didn't think it would elevate to that level.
>
> **[Prosecutor]:** No. But you could have simply gone to your

> car, like you did after you shot him, right? You could have gotten in your car and left?
>
> **[Defendant]:** I would imagine so.
>
> **[Prosecutor]:** But you didn't do that.
>
> **[Defendant]:** No, I didn't.

¶ 65 Instead of leaving during this opportunity, Defendant carelessly chose to remain in the area and stand his ground while Lonnie and his gang approached, with the obvious intention of fighting.

¶ 66 Thus, I believe the sum of the evidence clearly demonstrates that Defendant recklessly placed himself in a situation where he knew he would likely be forced to engage in criminal conduct. Defendant recklessly returned to Oakdale and lingered in the parking lot despite: (1) getting into a fight with the brother of a local gang leader only 30 minutes prior; (2) being told by a gang member not to come back; (3) being told by Darryl's wife that the people he had fought with were still at Oakdale; and (4) seeing that same gang leader approach him from across the lot.

¶ 67 Defendant argues that he should receive the justification instruction because this case is "significantly similar" to *Mercer*, but the evidence shows otherwise. The defendant in *Mercer* easily satisfied the second element of the *Deleveaux* test because he had no role whatsoever in bringing about the danger that befell him—he simply arrived at his home, fresh from a job interview, only to find himself ambushed by a hostile mob that was intent on fighting him and blocking him from entering his house.

*Mercer*, 373 N.C. at 460, 838 S.E.2d at 361. But unlike the defendant in *Mercer*, Defendant here knowingly placed himself into a situation where he knew that violence was likely to arise. Defendant had many opportunities to choose a safer path that day, but instead willingly chose a dangerous route at every turn. Defendant thus cannot satisfy the second element of the *Deleveaux* test.

¶ 68 Nor can Defendant satisfy the third element of the *Deleveaux* test—showing that he "had no reasonable legal alternative to violating the law." *Id.* at 464, 838 S.E.2d at 363. Even when viewing the evidence from Defendant's point of view, there were many rational alternatives that Defendant could have chosen instead of picking up a gun that day.

¶ 69 Defendant's own accounts differ significantly in describing how the second fight outside of Oakdale progressed. According to the statement that Defendant gave to Officer Warwick, after Lonnie began to hit Defendant, the two "got into a tussle," and "as they tussled, other individuals became involved in the altercation; [and] during the altercation, a gun just suddenly appeared." Defendant stated that he and Lonnie "struggled over the gun, that [Defendant] got the gun, and the gun went off."

¶ 70 According to Defendant's trial testimony, after Lonnie approached him and began hitting him, Defendant stumbled and fell backwards, and as he was sitting on the ground he heard Anthony say "back the F up" to "the other guys that were with [Defendant]." Defendant noticed "a gun on the ground" in front of him, but he did not

see where it came from. Defendant heard Darryl say "Watch out. He got a gun"—though it is unclear who Darryl was referring to. Defendant heard someone say "Pop him," and before Lonnie could reach for the gun, Defendant snatched it up and immediately shot.

¶ 71 Under either of these accounts, Defendant would have still had several reasonable legal alternatives to picking up the gun and shooting—he could have tried to exit the "tussle" as soon as other individuals became involved; he could have tried to flee to his car or into the apartment building; he could have kicked the gun away out of Lonnie's reach; he could have called for help; or asked his friends to help him fend off Lonnie so he could escape. Defendant chose none of these options, and instead chose to pick up the gun and shoot.

¶ 72 This conclusion is also supported by the forensic evidence presented at trial, which showed that Lonnie had died from a gunshot wound that entered in his back and exited through the front of his chest. This naturally raises the question—if Defendant was truly shooting to defend himself from an imminent threat, and if he truly had no other options, then why did he shoot Lonnie from behind while his back was turned?

¶ 73 Defendant again analogizes to *Mercer* in an attempt to support his argument, but the facts are distinguishable. In *Mercer*, the defendant only took possession of a gun after he heard the attacking group say they were "done talking," saw several of

them holding guns, and "heard the sound of guns cocking." *Mercer*, 373 N.C. at 460-61, 838 S.E.2d at 361. He then grabbed the gun from his cousin (who had been struggling to operate it), "shot back once" as he retreated, and then immediately "threw the gun back" to his cousin and ran away. *Id*. Here, even according to Defendant's own account, he never heard any guns cocking, and he never actually saw Lonnie or anyone else holding a gun. The only gun he saw was the one that mysteriously landed on the ground right in front of him. Moreover, once in possession of the gun, Defendant here (unlike the Defendant in *Mercer*) didn't simply fire a warning shot to cover his retreat as he fled—Defendant shot Lonnie Smith at close range, in the back, and fired at least two to three shots. This is not the behavior of a person who has no reasonable alternative to taking up a gun. Thus, I believe that Defendant cannot show that he had no reasonable legal alternative to violating the law, and he cannot satisfy the third element of the *Deleveaux* test.

¶ 74    I recognize that this case presents somewhat sympathetic circumstances—where a seemingly peaceable man, who had earlier gone out of his way to break up a fight, became embroiled in a conflict that he did not start. It is true that Defendant was not the initial aggressor in either of the fights that occurred that day. However, this does not change the fact that Defendant had many chances to do the prudent thing and prevent further violence from occurring—he could have simply not returned to Oakdale for the second time (knowing, as he did, that he was not welcome

and that another fight was very likely to ensue); he could have left or gone inside as soon as he saw Lonnie's group approaching from across the parking lot; or he could have sought an opportunity to escape the altercation instead of picking up a gun and shooting. But he did not.

¶ 75    Thus, because Defendant recklessly placed himself in a dangerous situation, and because he had several reasonable alternatives to breaking the law, I believe he cannot satisfy either the second or third element of the *Deleveaux* test. He was accordingly not entitled to have the justification instruction presented to the jury, and the trial court did not err in failing to provide the instruction. I therefore respectfully dissent.